IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALYNA WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 1574 |
| v. | ) | |
| | ) | Magistrate Judge Maria Valdez |
| UNION PACIFIC RAILROAD CO., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Alyna Walker brings this complaint against Defendant Union Pacific Railroad Co. ("UP") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended, and the Age Discrimination in Employment Act ("ADEA") of 1967, 29 U.S.C. § 621 *et seq.*, as amended, alleging employment discrimination. Count I alleges that he was harassed and denied a promotion based on his race; Count II alleges he was harassed and denied a promotion based on his age; and Counts III and IV allege retaliation for filing a charge of discrimination, in violation of Title VII and ADEA. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is now before the Court on UP's motion for summary judgment [Doc. No. 57]. For the reasons that follow, UP's motion is granted.

# FACTS

Unless otherwise noted, the following material facts are undisputed or are deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces.[1] Plaintiff was employed by Defendant from 1996 until his termination on July 26, 2007. (Def.'s LR 56.1(a)(3) ¶¶ 48, 57.) During his employment with UP, Plaintiff was a member of the International Association of Machinist and Aerospace Workers, and the terms and conditions of his employment were governed by a collective bargaining agreement. (*Id.* ¶ 6.) At the time of his termination, Plaintiff worked as a machinist in UP's commuter operations facility, known as M19A. (*Id.* ¶ 5.)

While employed at the M19A facility, Plaintiff had a number of documented incidents related to his behavior and performance. On August 13, 2001, Plaintiff's foreman attempted to give him a letter about Plaintiff's failure to clean a cart, but Plaintiff refused to take the letter. When the foreman instructed him to take it, Plaintiff stated that he did not have to take anything from him. (*Id.* ¶ 8.) Plaintiff was written up for this incident and was informed that if a supervisor asks him to do something, failing to do so is an insubordinate act. (*Id.* ¶ 9.)

On December 9, 2002, Plaintiff refused to perform a job assigned to him by another foreman. The M19A Supervisor notified the Shop Director, Don Thomas, Sr., of the incident in writing. (*Id.* ¶ 10.) The write-up, which described a violation of Rule 1.13 Reporting and Complying with Instructions, was given to Plaintiff by his foreman. Plaintiff responded, "I ain't signing this shit,

---

[1] Defendant first filed a motion for summary judgment on July 30, 2009. Plaintiff failed to respond to that motion by August 31, 2009, the date set forth in the Court's briefing schedule order. On March 16, 2010, Plaintiff moved for an extension of time, claiming that he was not aware of the briefing schedule. In an abundance of caution, the Court struck the motion without prejudice. After Defendant refiled the motion, the Court set another response date, advising Plaintiff that no further extensions would be allowed. Plaintiff again did not respond to the motion.

fuck that. I don't have to listen to you." (*Id.* ¶ 11.) The M19A Supervisor told Plaintiff that he could not talk to a supervisor like that, and Plaintiff responded, "I'll talk to him any fuckin' way I want to and I'll talk to you any fuckin' way I want to." (*Id.* ¶ 12.)

On October 10, 2003, it was reported that Plaintiff's foreman instructed him to perform a job, but Plaintiff said he would not do the job. (*Id.* ¶ 13.) Another supervisor noted three separate incidents, on October 16, 24, and 31, 2003, in which Plaintiff was uncooperative and confrontational over job assignments. (*Id.* ¶ 14.) On November 3, 2003, Plaintiff signed a Management/Employee/Union Conference report concerning his lack of teamwork and poor communication with another employee in relation to an incident that took place on October 31, 2003. (*Id.* ¶ 15.) On November 11, 2003, Andreas Bakopoulos[2] submitted a written complaint against Plaintiff, stating that Plaintiff had been making racial remarks to him and harassing him for quite some time. (*Id.* ¶ 16.) After this complaint, Plaintiff was told in a letter dated November 14, 2003 that he had to submit to a medical review and clearance in accordance with Defendant's medical rules and was temporarily removed from service pending the medical review results. (*Id.* ¶ 17.) Plaintiff submitted to the medical review and was medically cleared to return to work on December 16, 2003, with the requirement that he complete anger management counseling. (*Id.* ¶ 18.) Plaintiff later contested the medical leave through the grievance arbitration procedure of the collective bargaining agreement, but his claim was denied by the Public Law Board on July 11, 2005. (*Id.* ¶ 19.)

In May 2004, Plaintiff transferred from the M19A facility to the Global I facility; he returned to the M19A commuter operations facility in September 2006 and remained there until his

---

[2] Mr. Bakopoulos's title is not given.

termination. (*Id.* ¶ 22.) On October 13, 2006, William Martin came to work at 2:00 a.m. to conduct a safety class for the shift, and Plaintiff told him he was on a lunch break. Martin told Plaintiff that there was no break in his contract and the class was starting, after which Plaintiff argued with Martin, swore at him, and yelled, "You're not going to fucking tell me what to do, I'm no mother fucking kid." (*Id.* ¶ 24.) On November 10, 2006, Plaintiff received a Level 1 Coaching Session for his failure to comply with instructions from his manager John Corio. (*Id.* ¶ 25.)

On February 1, 2007, supervisor Dave Simmering assigned Plaintiff to complete a lube and fuel, and while they were talking about the job assignment, Plaintiff became argumentative and walked away. (*Id.* ¶ 26.) Later in the day, when Simmering asked Plaintiff whether he had the fuel ticket associated with the job, Plaintiff ignored him, threw the fuel ticket on Simmering's desk, and refused to respond to Simmering's questions as to whether the job was complete. (*Id.* ¶ 27.) On April 16, 2007, foreman Don Thomas, Jr. and supervisor Simmering saw Plaintiff working in an unsafe manner. When they told him to stop and correct it, Plaintiff refused until they forced him to do so. (*Id.* ¶ 28.) Two days later, Simmering reported to foreman Anthony Sabatine that Plaintiff refused to sign off on some work, and while Simmering was trying to explain to Plaintiff why it was necessary, Plaintiff walked away and disappeared for twenty-five minutes. (*Id.* ¶ 29.) When Sabatine met with Plaintiff to discuss the incident, Plaintiff raised his voice, became argumentative, and then walked away from Sabatine, who eventually sent Plaintiff home for the day. Sabatine noted that during their entire conversation, Plaintiff was quarrelsome, insubordinate, raising his voice, and would not let anyone else finish a statement without cutting them off. (*Id.* ¶ 30.)

On June 25, 2007, Plaintiff met with Shop Director Don Thomas, Sr. and Plaintiff's friend Al Maldonado, whom Plaintiff asked to be present. During this meeting, they talked about the

4

turmoil Plaintiff had created for his supervisors over the years, and Plaintiff stated he felt he knew more than a lot of his previous supervisors, and it was not right that they asked him to support them. (*Id.* ¶ 32.) Plaintiff was instructed that he should do what he is told by his supervisors, unless it was unsafe. During the conversation, Plaintiff interrupted with questions, which Thomas pointed out was the same issue his supervisors dealt with when trying to assign him work. (*Id.* ¶ 33.) On July 6, 2007, Sabatine again met with Plaintiff after learning that he refused a job assigned to him by foreman Marcus Dean. Plaintiff had felt that because he was senior, he could refuse the job and instead have a journeyman who was junior to him do the work. (*Id.* ¶ 34.) On July 25, 2007, Simmering assigned Plaintiff a job, and Plaintiff complained, claiming he was the senior man on the shift and questioning why another person was not assigned the work instead of him. Ten minutes later, Plaintiff told Simmering that his head hurt and he was going home. Simmering told Plaintiff to clock out when he left, but Plaintiff failed to do so. (*Id.* ¶¶ 36-37.)

At the start of the shift briefing on July 26, 2007, Simmering introduced Marcus Dean as the new third shift supervisor, explaining that Dean would be giving the job assignments and running the floor, and that Simmering would handle all of the computer work. (*Id.* ¶ 38.) Plaintiff then asked, "So who is my supervisor?" Simmering told him that both he and Dean were Plaintiff's supervisors. Plaintiff responded, "That ain't right, I can only have one supervisor." (*Id.* ¶¶ 39-41.) Later that day, when Dean assigned Plaintiff to perform a lube and monthly maintenance, Plaintiff responded, "You did not give me my job briefing, you're not my Foreman," and walked away as Dean called his name. (*Id.* ¶ 43.) Dean and Simmering found Plaintiff sitting at a computer. Dean told Plaintiff to complete the lube, but Plaintiff did not respond and instead stared at the computer. Plaintiff was asked several more times whether he was going to perform the job or answer their

5

questions, but Plaintiff remained unresponsive. (*Id.* ¶¶ 44-46.) Simmering and Dean then discussed that it was not safe for Plaintiff to be at work if he refused to answer to either of them. Simmering told Plaintiff to clock out, go home, and report back at his next scheduled shift. (*Id.* ¶ 47.) Afterwards, Richard Jacobs, Director System Locomotive Facility, decided to take Plaintiff out of service on July 26, 2007 pending an investigation. Don Thomas, Sr. notified Plaintiff of Jacobs's decision. (*Id.* ¶¶ 48-49.) Plaintiff was also sent a letter dated July 26, 2007, notifying him to report for an investigation and hearing on August 2, 2007 on charges that "at approximately 0200 hours on July 26, 2007, while working as a Machinist at M19A, you were allegedly insubordinate, and argumentative by refusing to follow instructions from your supervisor regarding work you were to perform on the UP 3586 and then later refused to answer questions asked by your supervisor." (*Id.* ¶ 50.) Plaintiff attended the investigation and hearing, at which he testified. (*Id.* ¶ 51.) Following the investigation, Jacobs made the decision to terminate Plaintiff's employment for violating UP's General Code of Operating Rules, Rule 1.6. (*Id.* ¶ 52.) Plaintiff later received a letter dated August 21, 2007 notifying him, in part, that:

> Based on careful consideration of the testimony adduced at this investigation, I find that there was more than substantial evidence presented at this investigation to support the charges brought against you and to support the conclusion that you were in direct violation of Rule 1.6, Conduct, Part 3, Insubordinate, Part 6, Quarrelsome and Part 7, Discourteous. Any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the Company or its employees is cause for dismissal and must be reported. Indifference to duty, or to the performance of duty, will not be tolerated, and Rule 1.13, Reporting and Complying with Instructions.
>
> Accordingly, you are hereby advised that you have been assessed Level 5 Discipline and [sic] effective on this date, August 21, 2007 and hereby dismissed from the service of the Union Pacific Railroad Company.

(*Id.* ¶ 53.)

Plaintiff's union appealed Plaintiff's dismissal, but the appeal was denied. In a June 9, 2008 letter, the union informed Plaintiff that in his case adjudicated before the Public Law Board, the arbitrator ruled in favor of Defendant and upheld Plaintiff's dismissal, finding:

> [Plaintiff] has frequently been charged with a failure to follow instruction. It is noted a majority of these charges occurred within two years preceding this instance. Those charges do not indicate the [Plaintiff] was guilty of insubordination. Regardless, his record over the last two-three years does not serve to mitigate his behavior here.
>
> There was no evidence presented to support the [Plaintiff's] allegations the Foreman had a bias or animosity towards the [Plaintiff]. Even if he did, his instruction to the [Plaintiff] was not unreasonable and was within the [Plaintiff's] job description.

(*Id.* ¶¶ 54-56.)

Plaintiff filed a charge of discrimination against UP on July 17, 2007, complaining as follows:

> I began my employment with Respondent on or about June 18, 1996. My current position is Machinist. During my employment I was subjected to a racist symbol. In May 2006 I complained to Respondent about the racial symbol. Since my complaint, I have been subjected to harassment. In December 2006, I applied for the Foreman position and was not selected.
>
> I believe that I have been discriminated against because of my race, Black, and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe that I have been discriminated against because of my age, 49 (dob 09/02/1958), in violation of the Age Discrimination in Employment Act of 1967, as amended.

(*Id.* ¶ 57.)

Plaintiff does not know when defendant received a copy of this charge, who knew of this charge, or who received it. Plaintiff also does not know whether the hearing officer at his termination hearing, John Kline, knew Plaintiff had filed a charge of discrimination against the company. (*Id.* ¶¶ 58-59.) Plaintiff believed that people at work did not know his age. (*Id.* ¶ 60.)

On July 30, 2007, Plaintiff filed another charge of discrimination against Defendant, complaining as follows:

> I filed EEOC Charge No. 440-2007-06405 against Respondent on July 17, 2007. I was subsequently suspended on July 26, 2007 and hearing date has been scheduled.
>
> I believe that I have been retaliated against for participating in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.
>
> I believe that I have been retaliated against for participating in protected activity, in violation of the Age Discrimination in Employment Act of 1967, as amended.

(*Id.* ¶ 61.)

Plaintiff's racial harassment charge alleges that in May 2006, he was subjected to a racist symbol and complained to Defendant about it. In his deposition, Plaintiff identified the racist symbol as a Confederate flag that had been drawn with a finger on the dirty window of a UP vehicle. After seeing the flag, Plaintiff called Defendant's internal police, who inspected the site, wrote an investigative report, and then removed the symbol. (*Id.* ¶¶ 62-63.)

Plaintiff alleges he was denied a promotion to the foreman position awarded to Don Thomas, Jr. on January 1, 2007. Plaintiff believed Don Thomas, Jr. got the foreman position because his father, Don Thomas, Sr., works for Defendant as the director of mechanical operations in commuter operations. (*Id.* ¶¶ 64-65.) The foreman position was awarded to Don Thomas, Jr. because he had bid on the position, completed the supervisory training, and worked as a relief supervisor. (*Id.* ¶¶ 66-67.)

Don Thomas, Sr. sent Plaintiff to supervisory training in 2002 or 2003. On the second day of training, Plaintiff was informed by two individuals that he had to go to third shift training, and his weekends probably would be Monday and Tuesday. Plaintiff asked that he be shown that in writing,

and they walked off. John Fincher[3] then approached Plaintiff and asked him what his intentions were for becoming a foreman. Plaintiff responded his intention was to become a foreman down there at Proviso and go back to M19A like Don Thomas wanted him to. After talking with others, Fincher returned to Plaintiff, told him that he was no longer needed there and to report back to M19A the next day. (*Id.* ¶¶ 67-71.) Completing supervisory training is a qualification for becoming a foreman. (*Id.* ¶ 72.)

## DISCUSSION

**I.     Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events. *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("'If the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'")

---

[3] Fincher's title is not given.

9

(citation omitted). "The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted).

Courts ruling on a motion for summary judgment are "not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 898 (7th Cir. 2003)); *see Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). Moreover, the Court is "'not required to draw every conceivable inference from the record.'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## II.     Unlawful Harassment Based on Age or Race

UP first argues that summary judgment should be granted as to Counts I and II, which allege racial and age-based harassment in violation of Title VII and the ADEA. To survive summary judgment on his harassment claims, Walker must prove four separate elements: (1) the work environment was both subjectively and objectively offensive; (2) his race or age must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there was a basis for employer liability. *See Montgomery v. Am. Airlines*, 626 F.3d 382, 390 (7th Cir. 2010).

Walker has failed to offer any disputed issue of fact relating to his claim of harassment based on age. There is no evidence in the record of any age-based harassment; indeed, Walker's own testimony establishes that no one at work was aware of his age.

Walker's claim of racial harassment is based upon his being subjected to a racially discriminatory symbol, namely a Confederate flag drawn in the dirt on a truck window. Even assuming that this incident satisfies the first two elements of the claim, Walker has failed to offer evidence proving the third or fourth elements. First, this incident is the only evidence in the record of racial harassment. This isolated event, which may or may not have been directed at Plaintiff, is insufficient to demonstrate that any harassment was severe or pervasive. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004); *Smith v. N.E. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004). Second, the record shows that as soon as Walker complained about the drawing, UP took the complaint seriously, immediately investigated the incident, and took prompt corrective action. Accordingly, there is no evidentiary basis for employer liability, and summary judgment must be granted as to Plaintiff's harassment claims. *See Porter v. Erie Foods, Int'l Inc.*, 576 F.3d 629, 636 (7th Cir. 2009).

### III. Race and Age Discrimination - Denial of Promotion

UP next seeks summary adjudication of Walker's claims in Counts I and II that he was unlawfully denied a promotion based on his age and/or race. At the summary judgment stage, there are two basic methods of proof in employment discrimination cases. Under the first method, a plaintiff may use direct evidence to prove that he suffered an adverse employment action based on an impermissible criteria. The second method is the familiar burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4]

---

[4] In this case, Walker does not appear to claim to have any direct evidence of discrimination.

Under the indirect method of proof, Plaintiff bears the burden of establishing a *prima facie* case of discrimination in promotion by showing: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was rejected for the position; and (4) the position was given to a person outside the protected class who was similarly or less qualified. *Jackson v. City of Chi.*, 552 F.3d 619, 622 (7th Cir. 2009).

UP argues that there is no evidence to support Walker's *prima facie* claim, specifically that he was qualified for the position or that the position was given to someone outside the protected class who was similarly or less qualified. There is no dispute that supervisory training was one of the qualifications for the foreman position; that Walker had the opportunity to complete supervisory training but did not do so; and that Don Thomas, Jr., who ultimately was given the foreman position, did complete supervisory training and was more qualified for the position than was Walker. Because there is no disputed evidence of any material fact related to Walker's failure to promote claims, summary judgment must be granted. *See id.* ("If the person who got the promotion was better qualified, the plaintiff's case fails.").

## IV. <u>Retaliation</u>

Finally, UP argues that summary judgment should be granted as to Walker's claims, in Counts III and IV, of retaliation in violation of Title VII and the ADEA. Walker asserts that he was suspended and then terminated in retaliation for filing a charge of discrimination. As with the failure to promote claims discussed above, Plaintiff can prove retaliation by showing "that [h]e (1) engaged in statutorily protected expression, (2) met the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected expression." *Kodl v. Bd. of Educ. School Dist. 45*, 490 F.3d

558, 562 (7th Cir. 2007). If Plaintiff demonstrates a *prima facie* claim, the burden of production shifts to Defendant to offer a legitimate, non-discriminatory reason for the employment actions. If Defendant meets its burden, then the burden shifts back to Plaintiff to demonstrate that the proffered reason was pretextual. *See Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002) ("In order to establish pretext a plaintiff must demonstrate that an employer's proffered explanation for an employment decision is a dishonest explanation, rather than merely an error.").

UP argues that the first and third elements of an indirect claim of retaliation contain an inherent requirement that the employer have knowledge of the statutorily protected activity, and that the record fails to show that UP knew of Walker's charges at the time the adverse employment actions were taken. Walker's statutorily protected expression was his filing of the EEOC charge on July 17, 2007. Walker claims that his suspension nine days later and termination just over a month later were in retaliation for his filing the charge. But the record fails to contain any evidence that Richard Jacobs, the decision maker who suspended and later terminated Walker, had any knowledge of the charge at the time Walker was suspended on July 26, 2007.[5]

UP further argues that Walker's documented record of insubordinate behavior is evidence that he was not performing up to UP's legitimate expectations, and his insubordination is also a legitimate non-discriminatory reason for suspending and then terminating him. In cases where the issues of satisfactory performance and non-pretextual reasons for termination overlap, courts may "skip over the initial burden-shifting of the indirect method and focus on the question of pretext." *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477-78 (7th Cir. 2010) (citations omitted) (explaining the overlap of issues, where an employee "was not meeting her employer's legitimate

---

[5] The record also does not indicate when UP was served with the charge.

expectations if she was insubordinate; insubordination is a non-discriminatory reason for termination; and [plaintiff] is not similarly situated only to other insubordinate employees").

UP has offered uncontradicted evidence that it suspended and terminated Walker for legitimate, non-pretextual reasons, namely his insubordination. Walker's behavioral issues were been documented on numerous occasions before the final incident on July 26, 2007. It is irrelevant whether Walker's behavior actually amounted to insubordination:

> The decisive question is whether [UP] genuinely believed that [Walker] had been insubordinate . . . . That a jury might disagree with them or even find that they erred in their assessment does not render their termination decision discriminatory. So long as they genuinely believed in the truth of their stated reason for the decision, that reason is not pretextual.

*Everroad*, 604 F.3d at 478 n. 2. Plaintiff has offered no evidence demonstrating that UP did not genuinely believe he was being insubordinate. Summary judgment is therefore granted as to Plaintiff's claims of unlawful retaliation.

## CONCLUSION

For the foregoing reasons, Defendant Union Pacific Railroad Co.'s Motion for Summary Judgment [Doc. No. 57] is granted.

**SO ORDERED.**　　　　　　　　　　　　　　**ENTERED:**

**DATE: January 10, 2011**

_/s/ Maria Valdez_
**HON. MARIA VALDEZ**
**United States Magistrate Judge**